UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

ANTONIO JOSEPH COPPOLA,                    :

                    Plaintiff,             :    18 Civ. 599 (HBP)

        -against-                          :    OPINION
                                                AND ORDER
NANCY A. BERRYHILL,                        :
Acting Commissioner of
Social Security,                           :

                    Defendant.             :

------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/21/19

        PITMAN, United States Magistrate Judge:

I.  Introduction

        Plaintiff brings this action pursuant to section 205(g)
of the Social Security Act (the "Act"), 42 U.S.C. § 405(g),
seeking judicial review of a final decision of the Commissioner
of Social Security ("Commissioner") denying his application for
supplemental security income benefits ("SSI").  Plaintiff and the
Commissioner have both moved for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure
(Docket Item ("D.I.") 16, 18).[1]  All parties have consented to my
exercising plenary jurisdiction pursuant to 28 U.S.C. § 636(c).

_____

        [1]I construe plaintiff's motion for remand as a motion for
judgment on the pleadings.

For the reasons set forth below, plaintiff's motion is granted
and the Commissioner's motion is denied.

II.  Facts[2]

A.  Procedural Background

Plaintiff filed an application for SSI on August 18,
2014, alleging that he became disabled on June 5, 1996, due to
symptoms related to his autism spectrum disorder,[3] attention-
deficit/hyperactivity disorder ("ADHD")[4] and anxiety (Tr. 18,

_____

[2]I recite only those facts relevant to the resolution of the
pending motions. The administrative record that the Commissioner
filed pursuant to 42 U.S.C. § 405(g) sets out plaintiff's social
and medical history more fully (Administrative Record, dated Apr.
12, 2018 (D.I. 13) ("Tr.")).

[3]Autism spectrum disorders refer to pervasive developmental
disorders "characterized by impairment of development in multiple
areas, including the acquisition of reciprocal social
interaction, verbal and nonverbal communication skills, and
imaginative activity and by stereotyped interests and behaviors;
included are autistic disorder, Rett syndrome, childhood
disintegrative disorder, and Asperger syndrome."  Dorland's
Illustrated Medical Dictionary, at 549, 552 (32nd ed. 2012)
("Dorland's").

[4]ADHD is defined in the DSM-IV as

        a childhood mental disorder characterized by
        inattention (such as distractibility, forgetfulness,
        not finishing tasks, and not appearing to listen) by
        hyperactivity and impulsivity (such as fidgeting and
        squirming, difficulty in remaining seated, excessive
        running or climbing, feelings of restlessness,
        difficulty awaiting one's turn, interrupting others,
                                            (continued...)

2

315). His application for benefits was initially denied on November 18, 2014, and he requested, and was granted, a hearing before an administrative law judge ("ALJ") (Tr. 18). On October 31, 2016, plaintiff appeared before ALJ Kieran McCormack for a hearing, at which plaintiff requested an adjournment to obtain counsel (Tr. 57-66). On January 23, 2017, plaintiff and his attorney appeared before the ALJ for the hearing, at which plaintiff and a vocational expert testified (Tr. 67-105). The ALJ issued his decision on April 10, 2017, finding that plaintiff was not disabled (Tr. 15-31). This decision became the final decision of the Commissioner on November 29, 2017 when the Appeals Council denied plaintiff's request for review (Tr. 1-5). Plaintiff timely commenced this action on January 23, 2018, seeking review of the Commissioner's decision (Complaint, dated Jan. 23, 2018 (D.I. 1)).

---

⁴(...continued)
and excessive talking) or by both types of behavior. The disorder is subtyped as predominantly hyperactive-impulsive type, predominantly inattentive type, or combined type, depending on the criteria met. Behavior must interfere with academic, social, or work functioning, with impairment existing in at least two settings. Onset is before age seven but it can persist into adulthood.

Dorland's at 547, 549.

B.  Social Background

        Plaintiff was born on October 10, 1993 and was 20 years
old when he applied for SSI (Tr. 242).  He lived with his parents
in Hyde Park, New York (Tr. 243, 324).

        Plaintiff's "Function Report," dated September 20, 2014
and completed by his mother, Elizabeth Coppola, listed his daily
activities as attending community college part-time, taking walks
and playing on his computer (Tr. 325).  If prompted by his
parents, he would feed the family dog or take it out for a walk
(Tr. 325).  Plaintiff was able to dress, bathe and feed himself,
but he needed reminders to wear clean or weather-appropriate
clothes and to brush his hair or get a haircut (Tr. 326).  He
also needed his parents to remind him to take his medications and
to provide the proper dose (Tr. 326).  Plaintiff prepared his own
cold meals, but his inattention made using the stove dangerous
(Tr. 327).  He helped with household chores but needed prompting
and an explanation of the necessary steps to complete the tasks
(Tr. 327).  Plaintiff shopped for video games, movies and toys
with an adult chaperone but was unable to pay bills or handle a
savings account (Tr. 328).

        Plaintiff reported that his hobbies included playing
computer games, collecting toys, watching anime movies and

reading anime books (Tr. 329). He spent time with family and with students in his classes, but apparently did not socialize with the other students in his classes (Tr. 329). In addition to attending his classes every day for two hours each day, he also attended church once per week (Tr. 329). He reported no problems getting along with family, friends, neighbors or others, but noted that his interactions with others were very limited (Tr. 329).

Plaintiff did not report any significant physical limitations, although he noted that his handwriting was very poor, he wore corrective lenses and he sometimes spoke very quickly with poor articulation (Tr. 330-31). He was unable to complete tasks without frequent prompting and making lists, he needed spoken or written instructions to be repeated, and he often forgot to complete tasks unless reminded (Tr. 331-32). He had no problems with people in authority, but stress or changes in his schedule caused him anxiety and frustration (Tr. 332).

Plaintiff's mother noted that although plaintiff attended a few college classes, he required significant help with scheduling, organization, transportation, food preparation, managing money and medical care (Tr. 337).

C. Medical Background

   1. Records Prior to the
      Relevant Time Period

      a. Hyde Park Central School District

Plaintiff's individualized education program ("IEP")
from Hyde Park Central School District for the 2011-12 school
year indicated that plaintiff needed to develop his written work
and to use his planner to record assignments (Tr. 272). He was
comfortable seeking support from adults and friendly and polite
with peers and adults (Tr. 273). Due to his discomfort with the
large cafeteria environment, plaintiff ate lunch in either the
guidance office or study hall (Tr. 273).

Plaintiff arrived to classes prepared and with the
necessary materials, but he needed class expectations made clear
to eliminate anticipatory stress (Tr. 273). He was allowed to go
to the guidance office when he felt anxious or overwhelmed,
including during assemblies or films with disturbing content (Tr.
273). In class, he sat near the door to accommodate his frequent
departures to use the bathroom, to get a drink or to calm down
(Tr. 273).

Among other recommended programs and services, plain-
tiff's IEP included daily refocusing and redirection to help him

6

remain on task, daily checks to make sure he understood class expectations, additional time to complete assignments and additional time to transition to and from classes (Tr. 275-76). In testing settings, plaintiff's IEP recommended, among other things, extended time and having directions read and explained to him (Tr. 277).

### b.    Franklin Academy

Plaintiff attended Franklin Academy, a specialized boarding school for students with learning disabilities and other impairments, for the 2011-12 and 2012-13 academic years (Tr. 530-607, 736-813).

### i.    2011-12 Academic Year

In Quint 1 of the 2011-12 academic year,[5] plaintiff received progress reports from his teachers in Applied Math II, Humanities II, Individual and Community and Integrated Science II (Tr. 558-61, 764-67). In Applied Math II, plaintiff attended all classes, arrived on time and completed his homework assignments

---

[5]Based on plaintiff's records from Franklin Academy, it appears that the academic year at that institution is divided into five periods called "quints," with two "intersession" periods, one between quints 2 and 3 and the other between quints 4 and 5.

(Tr. 558, 764). He asked questions to clarify directions and assignments, but he became frustrated with mathematical concepts and calculation (Tr. 558, 764). Plaintiff's teacher encouraged him to take breaks from class when he was "feeling elevated," and he usually returned to class in an appropriate frame of mind after a break (Tr. 558, 764). Plaintiff responded well to adult direction, and his peer interactions were generally positive (Tr. 558, 764).

In Humanities II, plaintiff arrived on time to class most of the time with all of the necessary materials (Tr. 559, 765). Early in the term he asked to leave the classroom frequently, but he was able to reduce these breaks to once per class by the end of the term (Tr. 559, 765). He completed and turned in all of his assignments and participated successfully in class (Tr. 559, 765). However, when working independently, plaintiff did not always follow directions or specific requirements (Tr. 559, 765). His interactions with peers were positive, and he participated in discussions appropriately (Tr. 559, 765).

In Individual and Community, plaintiff rarely arrived on time, nor was he prepared when he did arrive (Tr. 560, 766). He required prompts to stay on task in class, completed only half of the assigned homework and required one-on-one support to

8

complete the work (Tr. 560, 766). He was respectful to the teachers and interacted positively with his peers (Tr. 560, 766).

In Integrated Science II, plaintiff arrived on time to most classes and was usually prepared for class (Tr. 561, 767). He completed all of the assigned homework on time and demonstrated his understanding of the material with a score of 100 on his quiz (Tr. 561, 767). However, he struggled to print out his homework and turn it in before class started, took frequent breaks during class and required prompts to stay on task in class (Tr. 561, 767). Plaintiff was respectful to the teacher, but his interactions with peers were limited and he sometimes appeared frustrated by peers' comments (Tr. 561, 767).

In his Quint 1 skills assessment, plaintiff demonstrated low engagement and required excessive prompts from teachers or supervisors to meet expectations for timeliness and attendance, to focus on the task at hand, to transition to a new activity and to produce in-class work and homework effectively (Tr. 768). Plaintiff met basic developmental expectations in participating in class appropriately, following adult direction and asking for assistance if needed (Tr. 768). With respect to his social and emotional skills, plaintiff demonstrated low engagement and required excessive prompts from teachers or supervisors to identify feelings, regulate his emotions, engage

9

successfully with peers, adapt to community guidelines and show developing awareness of personal strengths and weaknesses (Tr. 768). Plaintiff met basic developmental expectations in demonstrating an understanding of the Code of Conduct and receiving feedback from others (Tr. 768). With respect to plaintiff's adjustment to boarding school, he met basic developmental expectations in all areas (Tr. 768).

In Quint 2, plaintiff's progress report in Theater and Performance noted that plaintiff arrived on time to class and followed directions well in class, but that he sometimes left the necessary materials in his dormitory (Tr. 554, 760).

In plaintiff's Quint 2 skills assessment, his performance improved in that he met basic developmental expectations in effectively producing in-class work (Tr. 555, 761). However, his ability to follow and adjust to his daily schedule regressed to the point of requiring excessive prompts from teachers or supervisors (Tr. 555, 761). In all other respects, plaintiff's evaluation was the same as in Quint 1 (Tr. 555, 761).

In Intersession 1, plaintiff received a progress report in Digital Microscopy (Tr. 552, 758). He was always on time and prepared for class, he was able to work independently without much assistance and his work met all of the requirements (Tr.

10

552, 758). However, plaintiff required frequent breaks from class (Tr. 552, 758).

In Quint 3, plaintiff received progress reports in Applied Math II, Humanities II, Individual and Community and Integrated Science II (Tr. 546-49, 752-55). In Applied Math II, plaintiff attended all classes but was frequently late or missing necessary materials (Tr. 549, 755). He had difficulty answering the teacher's questions correctly and expressed anger and frustration when a classmate asked a question or answered incorrectly (Tr. 549, 755). He turned in only two out of twelve homework assignments on time (Tr. 549, 755).

In Humanities II, plaintiff only attended 26 out of 36 classes and only arrived on time to 9 of the 26 classes that he attended (Tr. 546, 752). He was not always prepared for class, had difficulty staying on task and he needed to take breaks from the classroom (Tr. 546, 752). He completed only half of the assigned homework and struggled to retrieve and hand in the homework that he did complete (Tr. 546, 752). Plaintiff required assistance to refrain from outbursts in class and had difficulty interacting positively with his peers (Tr. 546, 752).

In Individual and Community, plaintiff struggled to get to class on time and to use his time productively while in class (Tr. 548, 754). He completed only some homework and interacted

11

only occasionally with his peers, but his interactions were positive and respectful with both peers and faculty (Tr. 548, 754).

In Integrated Science II, plaintiff missed four classes due to a family emergency and was late to four other classes (Tr. 547, 753). He was not always prepared for class and required class time to complete homework assignments (Tr. 547, 753). Early in the term, he made comments at inappropriate times and required reminders and extensions to complete assignments (Tr. 547, 753). By the end of the term, his homework production and conduct in class had improved (Tr. 547, 753). He took short breaks from class as needed (Tr. 547, 753).

In plaintiff's Quint 3 skills assessment, he met basic developmental expectations in effectively producing homework, adapting to community guidelines and showing awareness of personal strengths and weaknesses, all of which were improvements from Quint 2 (Tr. 550, 756). He also improved in keeping his room and personal belongings organized and taking care of his physical well-being, such that he required only minor supervision in performing those tasks (Tr. 550, 756). However, his abilities to participate appropriately in class or hall meetings and activities and to ask for assistance in class or in the dormitory regressed to the point of requiring excessive prompts from

teachers or supervisors (Tr. 550, 756). In all other respects, plaintiff's skills were the same as in Quint 2 (Tr. 550, 756).

In Quint 4, plaintiff received progress reports in Modern Music and Stop Motion Animation (Tr. 535-36, 741-42). In Modern Music, he had two excused absences and one unexcused absence and was late for class seven times (Tr. 535, 741). His organizational skills were fair, and he interacted positively with his teacher and peers (Tr. 535, 741).

In Stop Motion Animation, plaintiff arrived on time to class and immediately began working (Tr. 536, 742). He preferred to work alone, rather than in groups with peers, but he completed his assignments with little assistance (Tr. 536, 742). He took frequent breaks from class but was able to develop a complex story and complete tasks promptly (Tr. 536, 742).

In plaintiff's Quint 4 skills assessment, he met basic developmental expectations in focusing on the task at hand, an improvement from Quint 3 (Tr. 544, 750). However, plaintiff regressed in several skill areas (Tr. 544, 750). He required significant assistance in meeting expectations for timeliness and attendance (Tr. 544, 750). He required excessive prompts from teachers or supervisors to produce in-class work and homework effectively (Tr. 544, 750). He also had difficulties in under-standing of the Code of Conduct, in receiving feedback from

others and in tolerating the separation from his home and parents
(Tr. 544, 750). In all other respects, plaintiff's skills were
the same as in Quint 3 (Tr. 544, 750).

In Intersession 2, plaintiff received a progress report
concerning a class called "So You Want To Be A Superhero?" (Tr.
543, 749). Although he was enthusiastic about the class, he
struggled to participate appropriately and called out answers
out-of-turn (Tr. 543, 749). He took breaks from class and
struggled to apply written feedback from his teachers (Tr. 543,
749).

In Quint 5, plaintiff received progress reports in
Applied Math II, Humanities II and Integrated Science II (Tr.
532-34, 738-40). In Applied Math II, plaintiff attended all
classes but arrived late to half of them (Tr. 534, 740). He
frequently left necessary materials behind and his attempts to
organize himself were unsuccessful (Tr. 534, 740). He had some
verbal outbursts during class and needed breaks to calm down (Tr.
534, 740). His interactions with peers were generally positive
(Tr. 534, 740).

In Humanities II, plaintiff was consistently late and
missed significant portions of class (Tr. 532, 738). He lacked
the necessary materials for class, requested breaks often and had

14

difficulty staying on task (Tr. 532, 738). He completed only half of the class and homework assignments (Tr. 532, 738).

In Integrated Science II, plaintiff attended all classes, but he arrived late to class four times and was frequently missing necessary materials, which caused him to miss more class time while he retrieved them (Tr. 533, 739). He required additional time and one-on-one supervision to complete his work and needed breaks from class (Tr. 533, 739). He sometimes distracted his classmates with irrelevant remarks during class (Tr. 533, 739).

In plaintiff's Quint 5 skills assessment, he met basic developmental expectations and demonstrated an understanding of the Code of Conduct, an improvement from Quint 4 (Tr. 541, 747). He required excessive prompts from teachers or supervisors to meet expectations for timeliness and attendance, also an improvement from Quint 4 (Tr. 541, 747). However, plaintiff required significant assistance in controlling his emotions and excessive prompts from teachers or supervisors in focusing on the task at hand (Tr. 541, 747).

In a letter dated June 2012, a learning specialist, a residential dean and a clinical counselor summarized plaintiff's performance over the school year (Tr. 539-40, 745-46). They noted the degree to which plaintiff's anxiety negatively affected

15

his time management, self-control and his ability to transition from one activity to another (Tr. 539, 745). He frequently required two or three breaks in a one-hour class (Tr. 539, 745). A death in plaintiff's family in Quint 3 and adjustments to his psychiatric medication decreased his classroom and social func- tioning (Tr. 539, 745). As the year progressed, plaintiff required more time and more frequent interventions to reduce his anxiety (Tr. 540, 746). His homework production and punctuality suffered, as did his peer relationships (Tr. 540, 746).

### ii. 2012-13 Academic Year

In Quint 1 of the 2012-13 academic year, plaintiff received progress reports in Geometric Reasoning, Humanities II, Individual and Community and Integrated Science II (Tr. 566-69, 772-75). In Geometric Reasoning, he arrived on time to most classes and was usually prepared (Tr. 569, 775). He completed all of the homework assignments with a high level of accuracy (Tr. 569, 775). He participated in class discussions, but his responses to questions were often tangential and required redi- rection (Tr. 569, 775).

In Humanities II, plaintiff attended all classes but frequently arrived late to class (Tr. 566, 772). He completed all in-class and homework assignments, and his organizational

16

skills improved during the term (Tr. 566, 772). He required
multiple breaks from class each day, particularly when he was in
a heightened emotional state (Tr. 566, 772). His class partici-
pation was inconsistent, but he appeared less anxious when
discussing topics in which he showed interest (Tr. 566, 772).

In Individual and Community, plaintiff was able to
retrieve class materials, use his planner to record assignments
and complete all class work on time (Tr. 568, 774). He attended
class regularly, but he required frequent breaks from class and
appeared "overwhelmed [at] the expectation to be present for the
entire class period" (Tr. 568, 774). His participation in team
activities was lacking, but with prompting and when interested in
the topic, he interacted appropriately with his peers (Tr. 568,
774).

In Integrated Science II, plaintiff struggled to keep
himself organized, frequently arrived to class without necessary
materials and missed three out of ten assignments (Tr. 567, 773).
Although he attended class regularly, he required breaks during
class sessions (Tr. 567, 773). He interacted with the teacher
and his peers respectfully, but he occasionally became "testy
when concerned about time related issues" (Tr. 567, 773).

In Quint 2, plaintiff received progress reports from
his teachers in Feudal Japan and Role Play Game Design (Tr. 571-

17

72, 777-78). In Feudal Japan, he rarely arrived to class on time and was unprepared when he did arrive (Tr. 571, 777). He completed most homework assignments, but he participated in class reluctantly and took two or three breaks from class per session (Tr. 571, 777).

In Role Play Game Design, plaintiff attended most classes and arrived on time, but he sometimes left work in his room or was unable to find materials (Tr. 572, 778). He had difficulty meeting deadlines and required prompts to stay on task in class (Tr. 572, 778). He would occasionally leave class and struggled to stay focused and awake (Tr. 572, 778). His attention and participation improved towards the end of the term (Tr. 572, 778).

In an undated "Fall Assessment," a residential dean, a learning specialist and a counselor noted plaintiff's improvement in regulating his anxiety and arriving to class on time (Tr. 573, 779). Plaintiff continued to struggle with a lack of organization and resulting anxiety (Tr. 573, 779). He was able to tolerate one or two stressful situations when he received advance notice, but when confronted with increased obligations or unanticipated situations, he was unable to focus and became frustrated (Tr. 573, 779). He also struggled with internalizing

limits and boundaries and became frustrated when being told what to do (Tr. 573, 779).

In Intersession 1, plaintiff received a progress report in a course entitled "American Humor" (Tr. 579, 785). He attended every class but was frequently late (Tr. 579, 785). He asked for five to ten breaks each day, in addition to the breaks given to the entire class (Tr. 579, 785). He completed all of his in-class and homework assignments on time (Tr. 579, 785). He frequently interrupted class discussions with tangential comments, which detracted from his interactions with his peers (Tr. 579, 785).

In Quint 3, plaintiff received progress reports in Geometric Reasoning, Humanities II, Individual and Community and Integrated Sciences II (Tr. 582-85, 788-91). In Geometric Reasoning, he arrived on time for most classes and was usually prepared for class (Tr. 585, 791). He completed nine out of ten homework assignments, but he often appeared distracted during class (Tr. 585, 791). He struggled to estimate accurately how long it would take for him to complete aspects of his long-term assignments, requiring "extensive one-on-one support" to develop a reasonable plan for completion (Tr. 585, 791).

In Humanities II, plaintiff arrived to class on time and was consistently prepared (Tr. 582, 788). He completed all

19

homework assignments and took fewer breaks from class (Tr. 582, 788). He participated appropriately in class discussions without having to be called on, and when he felt overwhelmed or anxious, he addressed the issue appropriately with his teacher (Tr. 582, 788).

In Individual and Community, plaintiff attended all classes, arriving promptly and with most necessary materials (Tr. 584, 790). He had some difficulty retrieving materials from earlier in the term, but he turned in all of his assignments on time (Tr. 584, 790).

In Integrated Science II, plaintiff regularly arrived to class on time with all of the necessary materials and completed homework assignments (Tr. 583, 789). He required an average of one break per class (Tr. 583, 789). He required prompting to participate in class discussions, but his tolerance of his peers' distracting behavior improved (Tr. 583, 789).

In Quint 4, plaintiff received progress reports in Culture of the 60's and Hollywood Science (Tr. 587-88, 793-94). In Culture of the 60's, he arrived on time to class with the necessary materials and completed his homework assignments on time (Tr. 587, 793). He took several breaks from class during each class period, and when his teacher suggested bringing a water bottle to class to reduce the number of breaks, he did not

20

follow the suggestion (Tr. 587, 793).  He participated in class discussions consistently and without prompting (Tr. 587, 793).

　　　　In Hollywood Science, plaintiff struggled to arrive to class on time early in the term, and he was absent for the last class session (Tr. 588, 794).  He required three or four breaks per class, which caused him to miss important portions of the films being studied (Tr. 588, 794).  He struggled to complete assignments on time and often arrived in class without the current assignment (Tr. 588, 794).

　　　　In Intersession 2, plaintiff received a progress report in Japanese Language and Culture (Tr. 589, 795).  He attended all classes, arrived on time and was prepared with all necessary materials (Tr. 589, 795).  He also completed all in-class and homework assignments on time (Tr. 589, 795).  He participated actively in class and cooperated well with his peers (Tr. 589, 795).

　　　　In Quint 5, plaintiff received progress reports in Geometric Reasoning, Humanities II and Integrated Science II (Tr. 591-93, 797-99).  In Geometric Reasoning, he arrived late to multiple classes, but he usually had the necessary class materials (Tr. 593, 799).  He completed all of his homework assignments, although he turned in one assignment late (Tr. 593, 799).  He took breaks from class when he was tired or disengaged, but he

21

was usually able to re-engage with his work after a break (Tr. 593, 799).

In Humanities II, plaintiff missed only one class and generally arrived on time for class with all of the necessary materials (Tr. 591, 797). He completed all homework assignments and reduced the number of breaks taken during class (Tr. 591, 797).

In Integrated Science II, plaintiff regularly arrived on time to class and completed nine out of ten homework assignments, but he typically requested a break at the beginning of class and missed the first minutes of class (Tr. 592, 798). Despite his teacher discussing this issue with plaintiff, he was unable to change his routine (Tr. 592, 798). He struggled to stay on task for extended periods of time and requested a break once per class, but he returned to work quickly after a break (Tr. 592, 798). During independent class work time, his teacher observed plaintiff watching videos unrelated to class activities (Tr. 592, 798).

At the end of the 2012-13 academic year, plaintiff received a report titled "Present Level of Performance," summarizing his skills and progress over the course of the year (Tr. 594-601, 800-07). At the beginning of the year, plaintiff had significant difficulties in managing his emotions, which affected

22

all other areas of his life (Tr. 594, 800).  By the end of the

year, he was able to follow non-verbal prompts by teachers to

alert him when he felt anxious or needed to leave the classroom

(Tr. 595, 801).  He took fewer breaks from classes and was better

able to refocus when he returned to class (Tr. 595, 801).

Plaintiff also struggled with transitions from one class to

another or beginning difficult tasks (Tr. 595, 801).  He fre-

quently required breaks from classes and meetings, resulting in

missed information and disruption to activities (Tr. 595, 801).

Using a ball chair in classes, which provided physical stimula-

tion, reduced the number of breaks he needed, although the

frequency of his breaks varied with his anxiety level (Tr. 595-

96, 801-02).  Plaintiff's conceptual thinking and writing contin-

ued to require support and prompting from teachers (Tr. 597-98,

803-04).  His social skills also fluctuated with his anxiety

levels (Tr. 599-600, 805-06).

### c.  Dr. Molly Algermissen

In June 2012, Dr. Molly Algermissen, a neuro-

psychologist, evaluated plaintiff; only the odd-numbered pages of

her report appear in the record (Tr. 512-20, 717-25).  Based on

what is in the record, the report appears to be 17 or 18 pages

long (Tr. 512-20, 717-25).  Pages 2, 4, 6, 8, 10, 12, 14, 16 and

23

possibly 18 are missing (Tr. 512-20, 717-25). Without the complete report, it is impossible to summarize Dr. Algermissen's findings and opinions accurately and fairly.

### d. Dr. Agnes Whitaker

Between June and August 2012, Dr. Agnes Whitaker, a psychiatrist, evaluated plaintiff (Tr. 525-29, 731-35). She based her conclusions on clinical interviews with plaintiff and his parents, phone contact with plaintiff's family and two follow-up visits with plaintiff (Tr. 525, 731). Dr. Whitaker noted that plaintiff had been diagnosed with a pervasive developmental disorder, not otherwise specified, at two-and-a-half years of age and that he had alternated between mainstream public education with special education assistance and dedicated special education programs (Tr. 525, 731). At the time of the evaluation, plaintiff was home from Franklin Academy for the summer (Tr. 525, 731).

Plaintiff's parents told Dr. Whitaker that plaintiff was having problems at school, including disorganization, procrastination, pacing in the classroom and agitation (Tr. 525, 731). Plaintiff expressed anxiety concerning deadlines and schedules generally, which caused him to get frustrated with the people around him, which then, in turn, caused him anxiety about

24

having offended someone (Tr. 525, 731). For example, he worried that people would get angry with him because he misplaced his iPod (Tr. 525, 731). His parents did not observe any obsessive or compulsive symptoms, and plaintiff gave public presentations "without excessive perceptible anxiety" (Tr. 525, 731). Plaintiff was often late for class, somewhat disruptive in class and easily distracted (Tr. 526, 732).

In her structured diagnostic interview, Dr. Whitaker found that plaintiff's word use was repetitive, he made excessive use of emphatic gestures while describing frustrations and anxiety, and, although he gave reasonably detailed responses to questions, he did not ask about the interviewer's thoughts or experiences (Tr. 527, 733). Plaintiff made eye contact, but with an intense stare (Tr. 527, 733). He expressed the aspiration to become a film director, but lacked a realistic sense of what that achievement would entail (Tr. 527, 733).

In her clinical interview, Dr. Whitaker found plaintiff's affect to be happy, but with intense, staring eye contact and a tense posture (Tr. 528, 734). His responses to questions were slightly delayed, and when he responded, he spoke loudly and rapidly (Tr. 528, 734). He expressed no hallucinations, delusions or suicidal ideation, but he reported feeling anxious, both about ordinary scheduling matters and a recent fear that the

25

world would end (Tr. 528, 734). He was oriented as to time, date and place and spelled "world" backwards correctly, but he was unable to repeat three or more digits forwards and backwards and made numerous errors with serial subtractions (Tr. 528, 734).

Dr. Whitaker diagnosed plaintiff with autism spectrum disorder and ADHD, with significant difficulties in maintaining focus (Tr. 528-29, 734-35). She found that his anxiety was a symptom of his difficulty with transitions and need for structure and predictability, which she concluded was caused by his autism spectrum disorder, rather than a primary anxiety disorder (Tr. 528, 734). After a series of trials with his medication, Dr. Whitaker recommended daily doses of Celexa[6] and Strattera[7] (Tr. 529, 735).

---

[6]Celexa, the brand name for citalopram, is a selective serotonin reuptake inhibitor ("SSRI") "used to treat depression." Citalopram, MedlinePlus, https://medlineplus.gov/druginfo/meds/a699001.html (last visited Mar. 13, 2019).

[7]Strattera, the brand name for atomoxetine, is "used as part of a total treatment program to increase the ability to pay attention and decrease impulsiveness and hyperactivity in children and adults with ADHD." Atomoxetine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a603013.html (last visited Mar. 13, 2019).

2.  Records for the
    Relevant Time Period

    a.  Dr. Alex Gindes

On September 18, 2014, Dr. Alex Gindes, a consulting psychologist, evaluated plaintiff (Tr. 657-60, 818-21). Plaintiff reported that he had received treatment from a psychologist and a psychiatrist at a Columbia Presbyterian Hospital outpatient clinic in 2012 and 2013 (Tr. 657, 818). He had also received neurological assessments from Westchester Medical Center and New Haven Hospital (Tr. 657, 818). Plaintiff denied any significant medical history other than his autism spectrum disorder and ADHD (Tr. 657, 818).

Plaintiff reported that he ate normally and slept well (Tr. 657, 818). Dr. Gindes noted that plaintiff had a very limited social life and had difficulty responding appropriately to social cues, but that he did not exhibit any emotional dysfunction (Tr. 657, 818). Dr. Gindes observed that plaintiff had significant problems with memory, attention, focus, concentration and organization (Tr. 657, 818). Plaintiff denied any suicidal or homicidal ideation or any history of substance abuse (Tr. 657-58, 818-19).

27

In his evaluation of plaintiff's mental status, Dr. Gindes noted that plaintiff was cooperative but socially awkward (Tr. 658, 819). He was appropriately dressed and groomed, with normal motor behavior and eye contact, but his posture was tense (Tr. 658, 819). His speech was fluent, his voice was clear and his language skills were adequate, but he had problems with comprehension (Tr. 658, 819). Plaintiff's thought processes were somewhat compulsive, but Dr. Gindes observed no evidence of hallucinations, delusions or paranoia (Tr. 658, 819). Plaintiff's affect was tense and restricted, his mood was neutral and he was oriented as to time, place and person (Tr. 658, 819). His attention and concentration were impaired by anxiety and ADHD; he had difficulty with simple calculations and was unable to perform serial subtractions (Tr. 658, 819). His recent and remote memory skills were also impaired; he could recall only two out of three objects after a five-minute period and could recite only two digits forward and none backwards (Tr. 659, 820). Finally, Dr. Gindes found plaintiff's intellectual functioning to be within the normal range, his general fund of information was appropriate to his experience but his insight and judgment were limited (Tr. 659, 820).

Dr. Gindes noted that plaintiff was able to dress, bathe and groom himself, but he needed to be reminded to clean

28

his room (Tr. 659, 820). He did not cook, do laundry, shop, manage his own money or drive a car (Tr. 659, 820). His social life was limited to two or three friends, but his family relationships were normal (Tr. 659, 820). He enjoyed anime comics and worked at his family's restaurant in his free time (Tr. 659, 820).

In his medical source statement, Dr. Gindes wrote that plaintiff

> is able to follow and understand simple directions and instructions and perform simple tasks independently with no limitations. His ability to maintain attention and concentration is moderately limited. He is able to maintain a regular schedule with mild limitations. Abilities to learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress are all moderately limited. The claimant's difficulties are caused by autistic disorder and cognitive deficits associated with ADHD.
>
> The results of the examination appear to be consistent with psychiatric and cognitive problems and this may significantly interfere with the claimant's ability to function on a daily basis.

(Tr. 659, 820). Dr. Gindes diagnosed plaintiff with mild autism spectrum disorder and ADHD, predominantly inattentive type, and recommended that plaintiff continue with mental health treatment (Tr. 660, 821).

29

b.  Neil Stone

On October 30, 2014, Neil Stone, a learning specialist at Franklin Academy, completed a teacher questionnaire for plaintiff (Tr. 342-49).  He noted that he had known plaintiff for two years and, on average, saw him a few times per week (Tr. 342).  Although plaintiff was actually a twelfth grader, Mr. Stone indicated that plaintiff's reading skills were at an eleventh grade level and his math skills and written language skills were at a tenth grade level (Tr. 342).  He also noted that plaintiff received daytime and evening special education services in Franklin Academy's boarding school environment and that the school's student-to-teacher ration was two-to-one (Tr. 342).

Mr. Stone opined that plaintiff had problems acquiring and using information (Tr. 343).  Specifically, he found that plaintiff had serious problems understanding and participating in class discussions and providing organized oral explanations and adequate descriptions (Tr. 343).  He found that plaintiff had obvious problems comprehending and doing math problems, express-ing ideas in written form, learning new material, recalling and applying previously learned material and applying problem-solving skills in class discussions (Tr. 343).  Finally, he found that plaintiff had slight problems comprehending oral instructions,

understanding school and content vocabulary and reading and comprehending written material (Tr. 343).

Mr. Stone also opined that plaintiff had problems attending and completing tasks (Tr. 344). Specifically, he found that plaintiff had serious, daily problems carrying out multi-step instructions (Tr. 344). He found that plaintiff had obvious, daily problems changing from one activity to another without being disruptive and working without distracting himself or others (Tr. 344). He found that plaintiff had slight problems waiting to take turns and working at a reasonable pace or finishing on time (Tr. 344). Finally, he found that plaintiff had no problems paying attention when spoken to directly, sustaining attention during play or sports activities, focusing long enough to finish assigned activities or tasks, refocusing to a task when necessary, carrying out single-step instructions, organizing his own things or school materials, completing class or homework assignments and completing work accurately without careless mistakes (Tr. 344).

Mr. Stone opined that plaintiff had problems interacting and relating with others (Tr. 345). Specifically, he found that plaintiff had serious, daily problems seeking attention and expressing anger appropriately, relating experiences and telling stories, using language appropriate to the situation and listener

31

and interpreting the meaning of facial expressions, body language, hints and sarcasm (Tr. 345). He found that plaintiff had obvious problems playing cooperatively with peers, making and keeping friends, asking permission appropriately and introducing and maintaining relevant and appropriate topics of conversation (Tr. 345). He found that plaintiff had slight problems taking turns in a conversation and using adequate vocabulary and grammar to express thoughts or ideas in everyday conversation, and no problems following rules and respecting or obeying adults in authority (Tr. 345).

Finally, Mr. Stone opined that plaintiff had problems in caring for himself (Tr. 347). Specifically, he found that plaintiff had very serious, daily problems handling frustration appropriately, responding appropriately to changes in his own mood and using appropriate coping skills to meet the daily demands of the school environment (Tr. 347). He found that plaintiff had serious, daily problems being patient when necessary, identifying and appropriately asserting emotional needs and knowing when to ask for help (Tr. 347). However, he found that plaintiff had no problems taking care of personal hygiene, dressing, eating, taking his medications and using good judgment with respect to personal safety (Tr. 347).

c.  Dr. J. Dambrocia

On November 12, 2014, Dr. J. Dambrocia, a
psychologist,[8] provided a mental RFC assessment as part of the
initial disability determination explanation (Tr. 106-16).  In
rendering this opinion, Dr. Dambrocia apparently considered
plaintiff's medical and academic history, including the teacher
questionnaire completed by Mr. Stone, as well as the consultative
evaluation by Dr. Gindes (Tr. 107-08).

Dr. Dambrocia opined that plaintiff was moderately
limited in his ability to understand and remember detailed
instructions but that he was not significantly limited in his
abilities to remember locations and work-like procedures and to
understand and remember very short and simple instructions (Tr.
112).  Dr. Dambrocia found that plaintiff was moderately limited
in his abilities to carry out detailed instructions, to complete
a normal work day and work week without interruptions from
psychological symptoms and to perform at a consistent pace

_____

[8]The Social Security Administration's Disability
Determination and Transmittal lists Dr. Dambrocia's specialty
code as "38" (Tr. 117).  Code 38 refers to psychology in the
Social Security Administration's list of medical specialty codes.
DI 24501.004 Medical Specialty Codes, Program Operations Manual
System (POMS), Social Security Administration,
https://secure.ssa.gov/poms.nsf/lnx/0424501004 (last visited Mar.
6, 2019).

without an unreasonable number of rest periods (Tr. 112).
However, he was not significantly limited in his abilities to
carry out very short and simple instructions, to maintain atten-
tion and concentration for extended periods, to perform activi-
ties within a schedule, to maintain regular attendance and be
punctual within customary tolerances, to sustain an ordinary
routine without special supervision, to work in coordination with
or in proximity to others without being distracted by them or to
make simple work-related decisions (Tr. 112).

Dr. Dambrocia opined that plaintiff was moderately
limited in his abilities to interact appropriately with the
general public and to get along with coworkers or peers without
distracting them or exhibiting behavioral extremes (Tr. 113).
However, he was not significantly limited in his abilities to ask
simple questions or request assistance, to accept instructions
and respond appropriately to criticism from supervisors or to
maintain socially appropriate behavior and adhere to basic
standards of neatness and cleanliness (Tr. 113). Finally, Dr.
Dambrocia found that plaintiff was moderately limited in his
abilities to respond appropriately to changes in the work setting
and to set realistic goals or to make plans independently of
others, but that he was not significantly limited in his ability

to be aware of normal hazards and take appropriate precautions

(Tr. 113).

In a narrative summary, Dr. Dambrocia wrote that

plaintiff is

> able to understand and remember instructions and sus-
> tain attention and concentration for tasks.  Given
> reports and history, [plaintiff] may have difficulties
> relating with others and/or adapting to changes;
> [plaintiff's] ability to deal with co-workers and the
> public would be somewhat reduced, but adequate to
> handle brief and superficial contact.  Similarly, his
> ability to tolerate and respond appropriately to super-
> vision would be reduced, but adequate to handle ordi-
> nary levels of supervision in the customary work set-
> ting.

(Tr. 114).

### d.  Dr. Agnes Whitaker

On January 17, 2017, Dr. Whitaker completed a mental

impairment questionnaire and a physical medical source statement

for plaintiff (Tr. 999-1004).  In both documents she indicated

that she first evaluated plaintiff in 2012 and has treated him

since December 2016 (Tr. 999, 1001).  She opined that plaintiff's

autism spectrum disorder and ADHD were life-long conditions and

that plaintiff would require support throughout his life (Tr.

999).  She found that plaintiff was unable to concentrate or

listen well because of his ADHD and repetitive thoughts related

to his autism spectrum disorder (Tr. 999).  She listed his signs

and symptoms as impairment in impulse control, generalized persistent anxiety, difficulty thinking or concentrating, apprehensive expectation, emotional withdrawal or isolation, hyperactivity, motor tension, pressures of speech, easy distractibility and oddities of thought, perception, speech or behavior (Tr. 1000).

Dr. Whitaker opined that plaintiff had no physical impairments but that she expected his mental impairments to last at least twelve months (Tr. 1001). She opined that plaintiff's anxiety and ADHD would affect his physical condition and that he would require unscheduled breaks once per day and 15-minute periods of walking around every 20 minutes (Tr. 1001-02). She found that plaintiff would be off task 20 percent of each work day (Tr. 1003). She also found that if plaintiff felt he had misunderstood someone or failed at a task, the resulting stress would require him to take a break from work (Tr. 1003). Finally, she opined that plaintiff's impairments would produce good days and bad days and that he would be absent from work about once per month (Tr. 1003).

D. <u>Proceedings Before the ALJ</u>

1. <u>Plaintiff's Testimony</u>

Plaintiff testified that he had been diagnosed with an autism spectrum disorder, from which he had suffered his entire life (Tr. 76). He attended high school and graduated from Franklin Academy, a school for students with Asperger's syndrome and other similar disorders, and was attending college (Tr. 76). He also testified that he suffered from ADHD (Tr. 77).

Plaintiff testified that he worked at his family's restaurant during his summer breaks and other breaks from school (Tr. 74-75). His tasks included chopping meats and vegetables and other food preparation, washing dishes and vacuuming hallways (Tr. 75). He never worked as a waiter, but he did work as a bus boy a few times (Tr. 79). Plaintiff testified that he aspired to become a movie director rather than join the family business (Tr. 75).

Plaintiff described the symptoms of his autism spectrum disorder as "[m]ostly reclusiveness" and "a little higher sensitivity," meaning that "some things upset [him] more than others" (Tr. 77). However, he described himself as "very high functioning" (Tr. 77). He testified that it took him a while to open up to people, that he was hesitant to and frequently chose not to

37

socialize (Tr. 78). During school breaks, he socialized with two of his cousins who also worked at the restaurant (Tr. 79). Plaintiff testified that he did not have any problems being around large groups of people, either in the classroom or in supermarkets or malls (Tr. 83). Plaintiff also testified that his autism spectrum disorder and ADHD affected his ability to concentrate (Tr. 83-84). He stated that he got restless and had to leave the classroom once or twice per class (Tr. 84-85, 95-96). If a television show did not "go the way [he] want[ed] it to," he received bad news or if someone said something offensive to him online, he would be distracted and unable to focus on work (Tr. 84, 94-95).

Plaintiff testified that he took Celexa, Strattera and had recently started taking risperidone[9] (Tr. 76). He had been taking medications for his symptoms since the age of seven, with some changes over the years (Tr. 88). He testified that the

---

[9]Risperidone is an antipsychotic medication

> used to treat the symptoms of schizophrenia . . .
> episodes of mania . . . or mixed episodes (symptoms of
> mania and depression that happen together). . . .
> Risperidone is also used to treat behavior problems
> such as aggression, self-injury, and sudden mood
> changes in teenagers and children 5 to 16 years of age
> who have autism . . . .

Risperidone, MedlinePlus, https://medlineplus.gov/druginfo/meds/a694015.html (last visited Mar. 13, 2019).

medications helped in terms of his executive functioning (Tr. 89).

Plaintiff testified that he was attending a two-year program at Dutchess County Community college, majoring in communications (Tr. 79). He usually took two or three classes per semester, and his course of study included classes in both communications and core courses in math and science (Tr. 80-81). When taking tests, he had been allotted additional time and a separate room (Tr. 90). He testified that he had received passing grades and was generally an A or B student, with the occasional C (Tr. 81-82). He also participated in a gaming society, which included watching anime films and playing video games with other students (Tr. 82). He mentioned spending time with one friend at college and another friend from Franklin Academy (Tr. 82). Plaintiff did not have a driver's license, but his grandmother usually drove him to and from school, and he was learning how to use public transportation (Tr. 82-83).

When asked by the ALJ to describe his daily activities, plaintiff testified that after waking up in the morning, he makes his bed, dresses, drinks his coffee, takes his medication with breakfast and takes his dog for a walk (Tr. 92). His grandmother then picks him up and takes him to his classes and picks him up again at the end of his school day (Tr. 92-93). After returning

39

home, he does his homework, takes the dog out again, helps set the table for dinner, eats with his parents and then goes to bed (Tr. 93). On days off from school, he spends time with his social aide, taking the bus to the mall or a bookstore (Tr. 93). On Sundays, he goes to church, does his homework and has dinner with his grandmother and his immediate family (Tr. 94).

## 2. Vocational Expert Testimony

The ALJ asked vocational expert Michele Erbacher ("the VE") to consider possible jobs for a hypothetical person of plaintiff's age, education and experience, with a "full range of motion at all exertion exertional levels," who could only work at "low stress jobs, defined as jobs containing no more than simple, routine, repetitive tasks involving only simple, work-related decisions, with few if any workplace changes, and where there is only occasional interaction with supervisors, coworkers, and with the general public" (Tr. 100). The VE testified that such an individual could work as a floor waxer, DOT Code 381.687-034, with 15,000 jobs nationally, a janitor, DOT Code 381.687-018, with 53,000 jobs nationally, and a commercial or institutional cleaner, DOT Code 381.687-014, with 280,000 jobs nationally (Tr. 101). When the ALJ asked the VE to consider a hypothetical individual who cannot perform even simple, routine, repetitive

40

tasks involving only simple, work-related decisions, with few, if any, workplace changes, the VE opined that no jobs existed for such an individual, because he "cannot even perform unskilled work" (Tr. 101-02). When the ALJ asked the VE to return to the first hypothetical individual, but to add the limitation that the individual would be "off task by at least 15% of the day during the course of an eight-hour workday," the VE testified that no jobs existed for such an individual, because that percentage of the work day off-task would result in termination (Tr. 102).

When asked by plaintiff's counsel if an individual "would be competitively employable" if he were "unable to complete a full eight-hour workday," the VE testified that such an individual would be considered unreliable and his limitation would result in termination (Tr. 103).

III. Analysis

A. Applicable Legal
Principles

1. Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. §

41

405(g); Lockwood v. Comm'r of Soc. Sec. Admin., --- F.3d --- ,
2019 WL 366695 at *3 (2d Cir. Jan. 23, 2019); Selian v. Astrue,
708 F.3d 409, 417 (2d Cir. 2014) (per curiam); Talavera v.
Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Burgess v. Astrue, 437
F.3d 117, 127 (2d Cir. 2008). Moreover, the court cannot "affirm
an administrative action on grounds different from those consid-
ered by the agency." Lesterhuis v. Colvin, 805 F.3d 83, 86 (2d
Cir. 2015), quoting Burgess v. Astrue, supra, 537 F.3d at 128.

The Court first reviews the Commissioner's decision for
compliance with the correct legal standards; only then does it
determine whether the Commissioner's conclusions were supported by
substantial evidence. Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir.
2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).
"Even if the Commissioner's decision is supported by substantial
evidence, legal error alone can be enough to overturn the ALJ's
decision." Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y.
2009) (Marrero, D.J.). However, "where application of the correct
legal principles to the record could lead to only one conclusion,
there is no need to require agency reconsideration." Johnson v.
Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla.
It means such evidence as a reasonable mind might accept as
adequate to support a conclusion.'" Talavera v. Astrue, supra,

42

697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

### 2. Determination of Disability

A claimant is entitled to SSI if the claimant can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."[10]

---

[10]The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that (continued...)

42 U.S.C. § 423(d)(1)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months). The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Whether such work is actually available in the area where the claimant resides is immaterial. 42 U.S.C. § 423(d)(2)(A).

In making the disability determination, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (internal quotation marks omitted).

---

[10](...continued)
must be met in order to receive DIB under Title II of the Act. Barnhart v. Thomas, 540 U.S. 20, 24 (2003). Accordingly, cases addressing the former are equally applicable to cases involving the latter.

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 416.920(a)(4)(i)-(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151. The first step is a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 416.920(a)(4)(ii). If he does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC. 20 C.F.R. § 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25. If he cannot, then the fifth step requires assessment of whether, given the claimant's RFC, he can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(iv). If he cannot, he will be found disabled. 20 C.F.R. § 416.920(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite his limitations."

20 C.F.R. § 416.945(a)(1).  To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of [20 C.F.R. § 416.945]."  Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July 2, 1996).  The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy.[11] 20 C.F.R. § 416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may then be found to be limited further by nonexertional factors that restrict a claimant's ability to work.[12]  See Michaels v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

---

[11]Exertional limitations are those which "affect [plaintiff's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. § 416.969a(b).

[12]Nonexertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching.  20 C.F.R. § 416.969a(c).

The claimant bears the initial burden of proving
disability with respect to the first four steps.  Once the
claimant has satisfied this burden, the burden shifts to the
Commissioner to prove the final step -- that the claimant's RFC
allows the claimant to perform some work other than his past
work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v.
Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377,
383 (2d Cir. 2004), amended in part on other grounds on reh'g,
416 F.3d 101 (2d Cir. 2005).

When the ALJ finds that the nonexertional limitations
significantly diminish a claimant's ability to work, then the
Commissioner must introduce the testimony of a vocational expert
or other similar evidence in order to prove "that jobs exist in
the economy which the claimant can obtain and perform."  Butts v.
Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks and
citation omitted); see also Heckler v. Campbell, 461 U.S. 458,
462 n.5 (1983) ("If an individual's capabilities are not de-
scribed accurately by a rule, the regulations make clear that the
individual's particular limitations must be considered.").  An
ALJ may rely on a vocational expert's testimony in response to a
hypothetical if there is "substantial record evidence to support
the assumption[s] upon which the vocational expert based his
opinion."  Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir.

1983); accord Snyder v. Colvin, 667 F. App'x 319, 321 (2d Cir. 2016) (summary order) ("When the hypothetical posed to the vocational expert is based on a residual functional capacity finding that is supported by substantial evidence, the hypothetical is proper and the ALJ is entitled to rely on the vocational expert's testimony."); Rivera v. Colvin, 11 Civ. 7469 (LTS)(DF), 2014 WL 3732317 at *40 (S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided that the characteristics described in the hypothetical question accurately reflect the limitations and capabilities of the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.").

B.   The ALJ's Decision

The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 18-26).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the application date of August 18, 2014 (Tr. 20).

At step two, the ALJ found that plaintiff suffered from the following severe impairments: "autism spectrum disorder, ADHD and an anxiety disorder" (Tr. 20).

48

At step three, the ALJ found that plaintiff's mental impairments, considered individually or in combination, did not meet or exceed the criteria of listings 12.06, 12.10 and 12.11, 20 CFR, Part 404, Subpart P, Appendix 1 (Tr. 20). In reaching his conclusion, the ALJ stated that he considered whether the paragraph B criteria were satisfied and concluded that, because plaintiff's mental impairments did not cause at least one extreme or two marked limitations, the paragraph B criteria were not satisfied (Tr. 20, 22). The ALJ found that plaintiff was only moderately limited in understanding, remembering, or applying information (Tr. 21). In support of his finding, he cited plaintiff's ability to attend community college part-time, to work at his family's restaurant, and to follow instructions and to understand and respond to questions at the hearing (Tr. 21). The ALJ found that plaintiff was only moderately limited in interacting with others (Tr. 21). Again he cited plaintiff's ability to attend school and work at his family's restaurant, as well as his one friend in school and his cooperative and pleasant demeanor at the hearing (Tr. 21). The ALJ found that plaintiff was only moderately limited in concentrating, persisting, or maintaining pace (Tr. 21). Although the ALJ conceded that plaintiff had a history of problems in this area, the ALJ high-lighted plaintiff's ability to attend college part-time, where he

was able to give presentations, and his ability to follow along at the hearing (Tr. 21). Finally, the ALJ found that plaintiff was only moderately limited in adapting or managing himself (Tr. 21). He noted that plaintiff was able to care for himself and his dog, to make his bed, to prepare food, and to attend college and church (Tr. 22).

The ALJ also stated that he considered whether the paragraph C criteria were satisfied (Tr. 22). He found that plaintiff did not present with a serious and persistent disorder which satisfied both C1 and C2 criteria, "including, but not limited to having reached only a marginal adjustment despite ongoing persistent treatment" (Tr. 22).

The ALJ then determined that plaintiff retained the RFC to perform

> a full range of work at all exertional levels but with the following nonexertional limitations: [plaintiff] can only work at low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work related decisions; with few, if any, workplace changes; and where there is only occasional interaction with supervisors, coworkers and the general public.

(Tr. 22). To reach his RFC determination, the ALJ examined the opinions of the treating and consulting physicians and determined the weight to be given to each opinion based on the objective medical record, including the treatment notes of plaintiff's

treating physicians (Tr. 26-33). The ALJ also considered plain-
tiff's testimony and found that while plaintiff's medically
determinable impairments could reasonably have caused his alleged
symptoms, a review of the entire case record showed that plain-
tiff's statements regarding their intensity, persistence and
limiting effects were not entirely credible (Tr. 24).

The ALJ gave "significant weight" to Dr. Gindes's
opinion that plaintiff had moderate limitations in learning new
tasks, performing complex tasks, making appropriate decisions,
relating adequately to others and appropriately dealing with
stress, mild limitations in maintaining a regular schedule but
was able to understand and follow simple instructions and carry
out simple tasks (Tr. 23-24). The ALJ found this opinion to be
consistent with both the "overall conservative nature" of plain-
tiff's treatment and Dr. Gindes's own clinical findings (Tr. 24).
Dr. Gindes found that plaintiff had some limitations in social
and concentration skills but was pleasant, cooperative and well
groomed and exhibited normal motor behavior, appropriate eye
contact, adequate speech, a neutral mood and normal intellectual
functioning (Tr. 24).

The ALJ also gave "significant weight" to Dr.
Dambrocia's opinion that plaintiff's impairments caused only
mild-to-moderate limitations in his mental functioning, and that

plaintiff was able to understand and follow instructions, sustain concentration for tasks and deal with brief contact with co-workers and the public and ordinary levels of supervision in a work setting (Tr. 24, 112-14). The ALJ found this opinion to be consistent with the "conservative nature" of plaintiff's treatment and Dr. Gindes's clinical findings (Tr. 24).

The ALJ gave "little weight" to Dr. Whitaker's January 2017 opinion that plaintiff would be off-task for 20 percent of the work day (Tr. 25). The ALJ highlighted the temporal gap between plaintiff's 2012 evaluation and December 2016 treatment and concluded that Dr. Whitaker's opinion was not based on a longitudinal understanding of plaintiff's history and symptoms (Tr. 25). Furthermore, the ALJ found that Dr. Whitaker's opinions with respect to plaintiff's exertional limitations, time off-task and missing work were inconsistent with her finding that plaintiff had no physical complaints (Tr. 25). Finally, the ALJ found Dr. Whitaker's opinion to be inconsistent with plaintiff's testimony that he had no physical complaints and with the medical evidence which showed no physical impairments (Tr. 25).

The ALJ also gave "little weight" to the findings and opinions of plaintiff's teachers and the other sources of plaintiff's school records because they were rendered before plaintiff

turned 18 and are "less probative" of his functioning under adult standards (Tr. 25).

At step four, the ALJ found that plaintiff had no past relevant work, and, therefore, he proceeded directly to step five in his analysis (Tr. 25).

At step five, relying on the testimony of the VE, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, given his RFC, age, education and work experience (Tr. 25-26). Concluding that the expert's testimony was consistent with information in the DOT, the ALJ determined plaintiff could perform those occupations and, accordingly, was not disabled (Tr. 26).

C.  Analysis of the
    ALJ's Decision

Plaintiff attacks the ALJ's disability determination on three grounds: (1) the ALJ failed to give appropriate weight to plaintiff's treating mental health sources and, thus, neither plaintiff's RFC nor the hypotheticals posed to the VE were supported by substantial evidence; (2) the ALJ did not hear testimony from a medical expert to determine the impact of plaintiff's mental impairments on his ability to perform substantial gainful activity and (3) the ALJ erred in finding that

plaintiff's impairments did not meet or exceed the listings (Memorandum of Law in Support of Plaintiff's Motion for Remand for Further Administrative Proceedings, dated July 3, 2018 (D.I. 17) ("Pl. Mem.") at 20-30). The Commissioner contends that the ALJ's assessment of the evidence and his listings analysis were correct and that no testimony from a medical expert was necessary (Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings and in Response to Plaintiff's Memorandum of Law, dated Aug. 31, 2018 (D.I. 19) ("Def. Mem.") at 14-25).

As a threshold matter, I find that ALJ McCormack failed to discharge his duty to develop the record with respect to Dr. Algermissen's report. In addition, after reviewing the entire record, I also find that ALJ McCormack's RFC determination was not supported by substantial evidence.[13]

---

[13]Because pages are missing from Dr. Algermissen's report, rendering the record incomplete, I decline to reach the issue of whether plaintiff's impairments met or exceeded the listings. I also decline to reach the issue of whether the testimony of an additional medical expert was required; without the entirety of Dr. Algermissen's report, it is impossible to assess whether conflicts exist that would render additional medical testimony necessary or helpful.

1.  ALJ's Failure to
    Develop the Record

The ALJ's failure to obtain a complete copy of Dr. Algermissen's report requires that the matter be remanded for further proceedings.

"It is the rule in [the Second] [C]ircuit that 'the ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996), quoting Echeverria v. Sec'y of Health & Human Servs., 785 F.2d 751, 755 (2d Cir. 1982); Perez v. Chater, supra, 77 F.3d at 47 ("We have stated many times that the ALJ generally has an affirmative obligation to develop the administrative record . . . ." (internal quotation marks omitted)); Jackson v. Colvin, 13 Civ. 5655 (AJN)(SN), 2014 WL 4695080 at *15 (S.D.N.Y. Sept. 3, 2014) (Nathan, D.J.) ("Due to the non-adversarial nature of the social security proceedings, a full hearing requires the ALJ to affirmatively develop the record." (internal quotations and citation omitted)).[14] The ALJ's duty to develop the record exists irrespective of whether claimant is represented by coun-

_____

[14]On March 27, 2017, the ALJ's duty to develop the record was recodified from Section 416.912(d) to Section 416.912(b) without any substantive changes.

sel.  Shaw v. Chater, supra, 221 F.2d at 131 (2d Cir. 2000);

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. §

416.912(d).

The ALJ is required "affirmatively to seek out addi-

tional evidence . . . where there are 'obvious gaps' in the

administrative record."  Eusepi v. Colvin, 595 F. App'x 7, 9 (2d

Cir. 2014) (summary order), quoting Rosa v. Callahan, 168 F.3d

72, 79 & n.5 (2d Cir. 1999); accord Swiantek v. Comm'r of Soc.

Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (summary order).  The

ALJ's duty to develop the record requires that he obtain complete

reports from medical sources.  Truesdale v. Barnhart, 03 Civ.

0063 (SAS), 2004 WL 235260 at *6 (S.D.N.Y. Feb. 6, 2004)

(Scheindlin, D.J.) (ALJ failed to obtain complete report from

treating physician and failed to obtain missing page from report

of consulting physician); Encarnacion ex rel. George v. Barnhart,

00 Civ. 6597 (LTS)(THK), 2003 WL 1344903 at *2 (S.D.N.Y. Mar. 19,

2003) (Swain, D.J.) (ALJ failed to obtain missing pages from

psychological evaluation underlying plaintiff's IEP); accord

Williams v. Comm'r of Soc. Sec., 17-CV-01322 EAW, 2019 WL 851065

at *5-*6 (W.D.N.Y. Feb. 21, 2019).

In this case, the record contains only half of the

report from Dr. Algermissen's evaluation of plaintiff; pages 2,

4, 6, 8, 10, 12, 14, 16 and possibly 18 of the 17- or 18-page

56

report are missing (Tr. 512-20, 717-25).[15]  As a licensed neuro-psychologist, Dr. Algermissen is an acceptable medical source, 20 C.F.R. § 416.913(a)(2), and her evaluation of plaintiff's impairments -- a few months before his 19th birthday and just over two years before he filed his SSI application -- would likely inform the ALJ's assessment of plaintiff's disability.  Upon receiving a partial copy of her report, the ALJ had a duty to obtain a complete copy and to address her findings with respect to plaintiff's impairments in his decision.  His failure to do so requires that the case be remanded and the error be corrected.[16]

2.  ALJ's RFC Finding

a.  Treating Physician Rule

In considering the evidence in the record, the ALJ must afford deference to the opinions of a claimant's treating physicians.  A treating physician's opinion will be given controlling

---

[15]In the course of preparing this Opinion and Order, my staff consulted with counsel for the Commissioner to ascertain whether the ALJ had the pages that are missing from the record submitted to this Court.  I was concerned that, due to a clerical error, the record before me might not accurately reflect the record that was before the ALJ.  Counsel for the Commissioner advised that, to the best of counsel's knowledge, the pages were also missing from the record that was before the ALJ.

[16]Nowhere in his opinion does the ALJ even note that half of Dr. Algermissen's report is missing.  Thus, I have serious concerns about how diligently the ALJ reviewed the record.

weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 416.927(c)(2);[17] see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 416.927(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.). The Second Circuit "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'" Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order), quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015). If the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwar-

---

[17]The SSA adopted regulations that alter the standards applicable to the review of medical opinion evidence with respect to claims filed on or after March 27, 2017. See 20 C.F.R. § 416.920c. Because plaintiff's claim was filed before that date, those regulations do not apply here.

ranted.  See <u>Halloran v. Barnhart</u>, <u>supra</u>, 362 F.3d at 32-33; <u>see also</u> <u>Atwater v. Astrue</u>, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); <u>Petrie v. Astrue</u>, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); <u>Kennedy v. Astrue</u>, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given.  These factors include:  (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. § 416.927(c)(2)- (6); <u>Schisler v. Sullivan</u>, <u>supra</u>, 3 F.3d at 567; <u>Mitchell v. Astrue</u>, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.); <u>Matovic v. Chater</u>, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996) (McKenna, D.J.). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor.  <u>Atwater v. Astrue</u>, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order).

###### b.  Evaluating Disability
###### in Young Adults

The Social Security Administration has promulgated specific guidance with respect to the evaluation of disability in young adults, whom it defines as "people between the ages of 18 to approximately 25." SSR 11-2p, 2011 WL 4055665 at *1 (Sept. 12, 2011). The same definition of disability, rules and five-step sequential evaluation process apply to young adults as to older adults. SSR 11-2p, supra, 2011 WL 4055665 at *2; Marshall v. Berryhill, 8:16-2142-RMG-JDA, 2017 WL 2729863 at *20 (D.S.C. June 6, 2017) (Report & Recommendation); Grant v. Colvin, 14-cv-351-JD, 2015 WL 1292240 at *4 (D.N.H. Mar. 23, 2015). SSR 11-2p "instructs that ALJs consider evidence from other sources who are not medical sources, but who know and have contact with the young adult, such as family members or educational personnel[,] to assist in evaluating the severity and impact of a young adult's impairment(s)." Samuel v. Comm'r of Soc. Sec., 14 CV 4634 (PKC), 2015 WL 5774850 at *13 (E.D.N.Y. Sept. 30, 2015) (internal quotation marks omitted); accord Brown v. Comm'r of Soc. Sec., 17-cv-7566 (BMC), 2018 WL 4210134 at *6 (E.D.N.Y. Sept. 4, 2018) ("SSR 11-2p permits consideration of school records for young adults like plaintiff."); Hindsman v. Berryhill, 17-3612, 2018 WL 4568598 at *11 (E.D. Pa. Sept. 24, 2018) (when acceptable medical

source establishes existence of medically determinable impair-

ment, ALJ will consider all evidence relevant to disability

determination, including school records).

SSR 11-2p also addresses the task of extrapolating a

young adult's work-related limitations from his performance in

school.  The SSR acknowledges that

> the young adult's ability to function in settings that
> are less demanding, more structured, or more supportive
> than those in which people typically work does not
> necessarily show how the young adult will be able to
> function in a work setting. . . . The more extra help
> or support of any kind that a young adult receives
> because of his or her impairment(s), the less independ-
> ent he or she is in functioning, and the more severe we
> will find the limitation to be.

SSR 11-2p, supra, 2011 WL 4055665 at *7-*8; Barrios v. Colvin, CV

13-3319 AGR, 2016 WL 756457 at *6 (C.D. Cal. Feb. 24, 2016).

### c. Errors in the ALJ's
### RFC Determination

The ALJ erred by discounting Dr. Whitaker's opinion

that plaintiff's impairments would cause him to be off task 20

percent of the work day, to take breaks during the work day and

to miss work once per month.  He found that Dr. Whitaker's

opinion did not reflect a longitudinal understanding of plain-

tiff's impairments (Tr. 25).  He also found that her opinions

with respect to plaintiff's exertional limitations, being off

task and missing work were inconsistent with her findings and plaintiff's testimony that he had no physical complaints and the absence of any evidence of physical impairments in plaintiff's medical records (Tr. 25). None of these reasons provide a proper basis upon which to give Dr. Whitaker's opinion less than controlling or significant weight.

First, the ALJ's criticism that Dr. Whitaker's opinion did not reflect a longitudinal understanding of plaintiff's impairments is logically inconsistent with his award of significant weight to the opinion of Dr. Gindes. The ALJ correctly notes that Dr. Whitaker evaluated plaintiff in 2012 but did not begin treating him until December 2016. However, the mere fact that Dr. Whitaker encountered plaintiff in a medical setting on more than one occasion over a period of several years gives her a greater longitudinal understanding than Dr. Gindes, who evaluated plaintiff once. Notably, the field for "Longitudinal History" in Dr. Gindes's report is blank (Tr. 657, 818). Therefore, this is not a valid basis to discount Dr. Whitaker's opinion in favor of Dr. Gindes's.

Second, the ALJ either misread or misstated the bases for Dr. Whitaker's opinions. The ALJ wrote that Dr. Whitaker's opinions were inconsistent with her findings that plaintiff had no physical impairments, as well as plaintiff's testimony that he

had no physical complaints and the absence of any evidence of
physical impairments in plaintiff's medical records  (Tr. 25).
Although Dr. Whitaker completed both a mental impairment ques-
tionnaire and a physical medical source statement,[18] it is clear
from her responses that her opinions about plaintiff's time off
task, his need to take breaks during the work day and his likely
absence once per month are based on her assessment of his mental
impairments.  In the physical medical source statement, on the
line marked "Diagnoses," Dr. Whitaker identified plaintiff's
mental impairments:  ADHD, generalized anxiety disorder and
autism spectrum disorder (Tr. 1001).  She explicitly stated that
plaintiff had no physical complaints, but she indicated that his
anxiety, autism spectrum disorder and ADHD affected his physical
condition (Tr. 1001).  Where the physical medical source state-
ment asks, "What symptoms cause a need for breaks?" Dr. Whitaker
wrote in, "Hyperactivity as part of ADHD" (Tr. 1002).  Thus, it
is clear from Dr. Whitaker's responses that, contrary to the

---

[18]It appears that a page or pages are missing from Dr.
Whitaker's physical medical source statement.  The physical
medical source statement skips from question 11.h.2. (Tr. 1002)
to question m. (Tr. 1003).  Although the substance of Dr.
Whitaker's opinion is discernible from the available pages, upon
remand, the ALJ should make every effort to obtain a complete
copy of this report.

ALJ's characterization, she based her opinions on plaintiff's mental impairments.

Furthermore, Dr. Whitaker's opinions with respect to plaintiff's mental impairments are consistent with other evidence in the record, especially plaintiff's school records, which show a persistent pattern of disorganization, tardiness and inability to remain in class or stay on task. Although plaintiff's records from Franklin Academy indicate some improvement from the 2011-12 academic year to the 2012-13 academic year with respect to his punctuality and completion of work, his ongoing need to take breaks from class and his struggles to transition from one class or activity to another are well documented. For example, plaintiff's "Present Level of Performance" report, provided at the end of the 2012-13 school year, specifically noted his difficulties with transitions from one class to another or beginning difficult tasks (Tr. 595, 801), his frequent breaks from classes and meetings (Tr. 595, 801), and the fact that the frequency of his breaks varied with his anxiety level (Tr. 596, 802). Therefore, there is substantial support for Dr. Whitaker's opinion in the record, and the ALJ failed to give adequate reasons for declining to afford controlling or significant weight to Dr. Whitaker's opinion.

The ALJ also erred in giving little weight to the
opinions and findings contained in plaintiff's school records,
claiming that they "were all rendered prior to the claimant's
attainment of age 18 and are less probative of his functioning
under adult standards" (Tr. 25). First, the ALJ misstated when
these opinions and findings were rendered. Plaintiff was born on
October 10, 1993, which means that he turned eighteen in the
early part of his first of two academic years at Franklin Acad-
emy. Thus, the opinions and findings contained in most of
plaintiff's progress reports, skills assessments and other
records from Franklin Academy, and certainly Mr. Stone's October
2014 teacher questionnaire, were rendered after plaintiff's 18th
birthday.

Second, and perhaps more importantly, by failing to
examine and discuss plaintiff's school records, the ALJ disre-
garded the Administration's guidance as set forth in SSR 11-2p.
Given the temporal gaps between plaintiff's psychiatric evalua-
tions and the lack any significant work experience from which to
draw comparisons, plaintiff's school records provide the most
comprehensive evidence of his level of functioning in the period
preceding his application for SSI. Furthermore, as SSR 11-2p
cautions, plaintiff's level of functioning at a highly supportive
boarding school for special needs students likely understates his

work-related limitations. Even in a low stress job with only simple, routine tasks and few workplace changes, without the supports provided by his school environment plaintiff's limitations with respect to punctuality and persistence would likely be more pronounced. Thus, the ALJ's failure to analyze this evidence compromised his RFC determination.

In conclusion, because the ALJ failed to develop the record with respect to the pages missing from Dr. Algermissen's report, afforded too little weight to Dr. Whitaker's opinions and failed to examine and incorporate plaintiff's school records, remand is required.

IV. Conclusion

Accordingly, for all the foregoing reasons, plaintiff's motion is granted, the Commissioner's motion is denied and the case is remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of the Court is respectfully requested to mark this matter closed.

Dated:     New York, New York
           March 21, 2019

                              SO ORDERED

                              _____
                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

All Counsel